# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## DEPARTMENT OF CORRECTIONS

Office of the External Confinement
& Monitoring Administration

★★★

*Exhibit (1)*

## MEMORANDUM

TO:         Keionta Hagan
            289-792

FROM:       Barbara A. Hart
            Contract Monitor

DATE:       June 4, 2004

SUBJECT:    Investigation

_____

Inmate Hagan this is in response to your May 14, 2004 inquiry in reference to an allegation of excessive use of force by Captain Dale London.

Internal Affairs (CCA/CTF) investigated your allegation.  Warden Figueroa is imposing corrective/adverse action against Captain London.

cc:  Warden Figueroa

*05 1917*

**FILED**

SEP 2 9 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT



**CORRECTIONS CORPORATION OF AMERICA**
Correctional Treatment Facility

| *Memorandum* |
| --- |

TO:           F. E. Figueroa, Warden

FROM:      Don Paul
                  Internal Affairs Investigator

DATE:       1 June 2004

RE:            Keionta Hagens, DC-DC 284792

SUBJECT:   Use of Force Review

---

Reporting investigator was directed to review a use of force which occurred on Thursday, April 1, 2004. Two staff members were primarily involved with physical intervention, namely Shift Supervisor James Mayes, and Shift Supervisor Dale London. The affected inmate that refused to comply with directives and resisted restraints was identified as Keionta Hagens, DC-DC 284792. Research suggests Hagens has an explosive history of assaults on correctional staff. Color photographs revealed latent hand marks about the neck of Hagens after he stopped resisting and was taken to medical, which became the focus of this inquiry. The narrative of the Incident Report 5-1A did not support or clearly present how those injuries occurred. The fact that Mayes was assaulted by Hagens was not disputed.

Shift Supervisor James Mayes was interviewed in Internal Affairs responsive to this incident. Mayes recalled that this use of force took place during the facility wide shakedown on April 1, 2004. He stated that Hagens became hostile and attacked him after being told that he would not receive certain property which had been confiscated as contraband. According to Mayes, Captain London was nearby and came to his assistance when Hagens jumped and struck him in the upper chest area. Mayes was asked specifically how the hand marks occurred on the neck of Hagens. Mayes stated that London did place his right hand on the neck of Hagens, and explained action that in the narrative of the report. Mayes was asked how long London left his hand on Hagens' neck. Mayes could not recall. Mayes was then shown the photographs of Hagens in medical taken some twenty minutes after the use of force occurred. The photographs clearly indicate possible choking. Mayes was asked to discuss where in CCA Policy 9-1 or PPCT training that use of sustained hand holds on the neck of a resisting subject were authorized or permitted. Mayes stated he was not sure if choke holds were authorized. Mayes was asked if London submitted an incident statement (5-1C) in reference to this use of force. Mayes could not recall. Mayes was asked if he knew who prepared the incident report on the use of force with Hagens. Mayes stated he thought London did.

Shift Supervisor Dale London was interviewed in Internal Affairs responsive to this incident.

Chief of Security Larry Bynum was present and observed. London was advised of the nature of the use of force review, specifically focusing on the hand marks about Hagens' neck and throat. Additionally, the inmate alleged that he had been choked during the confrontation. London was shown the photographs of Hagens taken in medical some twenty minutes after the incident occurred. The photographs clearly indicate possible choking occurred. London was asked if he submitted an incident statement (5-1C) in reference to this use of force. London stated that he did not, but had explained it in the narrative of the report. It was pointed out that Assistant Shift Supervisor Ricardo Rich was typed on the 5-1A Incident Report as the person preparing the report, but the language of the report suggested that London was the author. London admitted that he did prepare most of the narrative on the Hagens use of force (5-1A). In consideration of photographs showing a marked hand print about the neck and throat of Hagens, London was directed to describe in detail and explain how the incident occurred. London stated that during the shakedown, Mayes was assaulted by Hagens. In the process of trying to gain control of the unruly inmate, London stated that he attempted to grab hold of Hagens' shirt top, but his right hand slipped and ended up on Hagens' neck. When asked how long he held onto Hagens' neck, London initially stated he let go immediately. Photographs showing finger marks on Hagens' neck and discoloration about the trachea area was again presented for London to examine. It was pointed out that photographs of Hagens' neck and throat were made some twenty minutes after the incident, and latent markings and discoloration should not be as pronounced if London had immediately released his grip as claimed. London then admitted that he held Hagens by the neck several seconds and took Hagens down to the floor with his hand gripped about the neck. London was asked where in CCA Policy 9-1 or PPCT training that use of sustained hand or choke holds on the neck of a resisting subject were authorized or permitted. London shrugged his shoulders and did not answer. London was asked whether or not the resistance from Hagens was sufficient to support use of deadly force as a means of intervention. London stated that grabbing Hagens by the neck was not intentional. London was again asked if physical resistance by Hagens was sufficient to justify use of deadly force by choking. London again stated that grabbing Hagens by the neck was not intentional and he did not mean to choke him. It was pointed out for the record that London had excluded specific details of his role in the use of force, and neglected to submit a 5-1C on the incident. The 5-1A on the incident also failed to mention any of the obvious injuries to the neck/throat area of Hagens at item 5, page 4. For the record, London was also informed that CCA does not authorize the use of choke holds anywhere in CCA Policy 9-1, Use of Force, nor are application of choke holds by hands alone taught as part of PPCT training. London was directed to submit a thorough 5-1C incident statement addressing his involvement in the use of force with Hagens.

Assistant Shift Supervisor Ricardo Rich was interviewed responsive to the Hagens incident report on the use of force. Rich admitted that he did not write the narrative contained on the initial 5-1A packet, and was not very familiar with the specific facts as cited. Rich believes London prepared this report, and most of the incident reports from the shakedown.

In conclusion, the facts of this inquiry suggest that a use of force was made unavoidably necessary by undisputed aggressive and assaultive behaviors initiated solely by Keionta Hagens without warning. Specifically Hagens violently struck Shift Supervisor Mayes in or about the upper chest. However, nothing in the record supports using an unauthorized choke hold to intervene and maintain control of Hagens' combative behaviors. Through his own conduct, Dale London failed to be completely truthful and honest when reporting his role in this use of force, and neglected to submit a 5-1C incident statement in the follow up investigation until directed to do so by Internal Affairs. During the interview, London was initially evasive and minimized placement of his hand on Hagens' neck, which inadvertently resulted in Hagens being choked during the scuffle. Under the scope of CCA Policy 9-1 on Use of Force, use of deadly force by choke hold or the equivalent thereof was not a supported intervention method based on the facts present within this incident. Failure by London to accurately report involvement in a use of force constitutes violation of CCA Policy 5-1 on Incident Reports, and

Fred Figueroa - London_hagan_BRP.doc

CCA Policy 3-3 on Business Ethics and Conduct.

| | |
|---|---|
| **From:** | Fred Figueroa |
| **To:** | barbara.hart@dc.gov |
| **Date:** | 06/03/2004 02:04:55 PM |
| **Subject:** | Investigation on Inmate Hagens # 284792 |

I have sent this to Charles Martin. I will advise you of the corrective action that is to follow.


Fred Figueroa
1901 E Street SE
Washington, DC 20003
Work 202 698 3006
Fax    2o2 698 3301
fred.figueroa@correctionscorp.com


**CC:**          Leggon, Rose

Fred Figueroa - TEXT.htm

I have sent this to Charles Martin. I will advise you of the corrective action that is to follow.


Fred Figueroa
1901 E Street SE
Washington, DC 20003
Work 202 698 3006
Fax    2o2 698 3301
fred.figueroa@correctionscorp.com