(1.)

COURT FOR THE DISTRICT OF COLUMBIA

I

Keionta Hagens (Plaintiff)

RECEIVED

JUN - 5 2006

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

v)

Corrections Corporation of America
et al, Defendants

Civil Action No. 1.05.-
CV-01917 (CKK)

## Motion to oppose Summary Judgment

Now here comes Plaintiff Keionta Hagens
To oppose defendants motion for
Summary Judgment.

## FACTS

Plaintiff Hagens was "violently Assaulted"
on (April 1st 2004) by Defendants
London and defendant Mayes who at
all times mentioned was acting under
color of law as Correctional officers
for Corrections Corporation of America.
Defendants (CCA) London and Mayes
and District of Columbia showed
A total disregard and a pattern of
Diliberate Indifference to a pattern
of Abusive behavior by defendants
AND Harrassment by its Correctional
Staff, Plaintiff Hagens will again
Show with material facts of
Genuine Issue why Summary Judgment
Should not be granted....

PLAINTIFF HAGENS MOVES this COURT to
VIEW (EXHIBIT 1) MEMORADUM to (WARDEN
F.F. FIGUEROA) FROM DON PAUL INTERNAL
AFFAIRS INVESTIGATOR ON (JUNE 1, 2004)
where both DEFENDANTS LONDON AND MAYES
Were FOUND guiltey OF USING EXCESSIVE
FORCE AND "LYING" ON the ~~~~ "iTNITIAL
REPORTS.

PLAINTIFF HAGENS MOVES this
COURT to VIEW (EXHIBIT 2.) N.B.C. DATELINE
(OCTOMBER 11, 1998) SOME SEVEN (7 YEARS) AGO
OF the WOIDESPREAD [N]ATIONAL KNOWN
ABUSIVE NATURE OF DEFENDANTS (CCA) AND
Its CORRECTIONAL STAFF, the history OF
DEFENDANTS CCA, et AL is WIDELY RECONIZE
AND NOTHING HAS CHANGED SINCE its
CONCEPTION ONLY MORE ABUSE AND CORRUPTION

PLAINTIFF HAGENS AGAIN MOVES this COURT
TO VIEW (EXHIBIT 3.) C.B.S. 60 MINUTES
(MAY 7, 1998) FOR the DISTRICT OF COLUMBIA
TO CLAIM NO KNOWLEGE OF the history
OF (CCA) AND what they have been
RECONIZED FOR PROFIT AND ABUSE is
ABSURD AND A LIE ON behALF OF the
DISTRICT OF COLUMBIA, they KNEW OF the
THE HISTORY OF the DEFENDANTS et AL
AND WENT INTO A CONTRACT TO ALLOW
THE DEFENDANTS to OPEN AND OPERATE
A FACILITY IN the DISTRICT OF COLUMBIA
AND this IN itself MAKES them liable
UNDER MUNICIPALITY AND VIOLATING

PLAINTIFF HAGENS CONSTITUTIONAL RIGHTS
PROTECTED BY THE UNITED STATES CONSTIT-
UTION, OF AMERICA.

PLAINTIFF HAGENS MOVES this COURT to
VIEW (Exhibit 4) DATED (5-23-04) WHERE'S
PLAINTIFF HAGENS AGAIN FILES ANOTHER
GRIEVANCE two (2) DAYS AFTER his ALLEGED
WITHDRAWAL SIGNATURE SUPPORTED by
DEFENDANTS MOTION, to DISMISS PURSUANT
TO (42 U.S.C. & 1997 e).

PLAINTIFF HAGENS HAS CLEARLY SHOWN IN
(EXHIBIT 1) DEFENDANTS HAS SHOWN A PATTERN
OF "COVER-UPS LYING" FALSEFYING REPORTS
To GAIN the ADVANTAGE JOYCE ALLEN
DELIBERATELY took ADVANTAGE OF PLAINTIFF
HAGENS LACK OF KNOWLEGE AND his
BEING A ILLIERATE PRISONER to FALSE-
FY, his SIGNATURE AND LIED to PLAINTIFF
HAGENS AS to that his GRIEVANCE WAS
still being INVESTIGATED.

PLAINTIFF HAGENS WAS IMMEDIATLY
TRANSFERED APPROXIMATELY (2 WEEKS)
AFTER he FILED the GRIEVANCE, this
WAS A DELIBERATE ATTEMP to COVER-UP
AND hide this BRUTAL ASSAULT ON
PLAINTIFF HAGENS WHO IS ILLIERATE
INMATE AND his TRANSFER WOULD
hinder his ATTEMPS to GET this
WRONG RIGHTED AND that the
DEFENDANTS be PUNISHED ACCORDLY!

(4 pges)

## IV

PLAINTIFF HAGENS is solely realible on writ "writer jailhouse lawyer" who has done his whole law suit due to PLAINTIFF HAGENS being "illierate" prisoner.

## MEMORANDUM OF LAW

Motion to dismiss may only be granted if it appears beyond dought that plaintiff cannot prove no set of facts in support of his claims which would entitled him to relief. Ang V Procter N Gamble 932 F.2d 804 (1991)

In deciding such amotion the court must accept as true all well-pleading factual allegations and draw all resonable inferences in favors of the plaintiff. see MacJack Prods V Motion Picture Ass'n 311 U.S. App. D.C. 224, 52 F.3d 373, 375 (D.C. Cir 1995)

The court may consider the allegation of the complaint, documents attached to or specifically referred to the complaint and matters of public record. see Wright & Miller

(5. pge)

## V

FEDERAL PRACTICE & PROCEDURE R 1357
AT (299 2ND 1990)...

EVERY PERSON INCLUDING AN INDIVIDUAL
INCARCARATED HAS THE RIGHT TO BE
FREE FROM FEAR OF OFFENSIVE BODILY
CONTACT AND TO BE FREE FROM
ACTUAL OFFENSIVE BODILY CONDUCT
(ANY) PERSON WHO VIOLATES EITHER OR
THESE RIGHTS CAN BE HELD LIABLE
BOTH CIVILLY AND CRIMINALLY. SEE
JHONSON V GLICK 481 F.2D 1028
AT 32-33...

IN CONSIDERING SUMMARY JUDGMENT
MOTION COURT MUST "EXAMINE FACTS"
IN LIGHT MOST FAVORABLE TO PARTY
OPPOSING THE MOTION. GILLOT V
POWEREX INC. W.D. P.A. (1995) 904
F. SUPP. 442

COURT MAY NOT CONSIDER CREDIBILTY
OR WEIGHT OF EVIDENCE IN DECIDING
MOTION FOR SUMMARY JUDGMENT EVEN
IF QUALITY OF MOVING PARTY
EVIDENCE FAR OUTWEIGHS THAT OF
ITS OPPONENT. SUPERFRESH FOOD
& COMMERCIAL WORKERS LOCAL UNION
1776 E.D. P.A. 2003 249 F.SUPP. 2D
546

CREDIBILITY determinations weighing
of evidence and drawing of legitimate
INFERENCES FROM FACTS ARE FUCTIONS
OF JURY OR TRIER OF FACT AT TRAIL
AND NOT FUCTION OF JUDGE RULING ON
MOTION FOR SUMMARY Judgment. See
RUSSMAN by RUSSMAN V BOARD OF EDUC.
OF ENLARGED CITY SCHOOL DIST. OF CITY
OF WATERVLIET N.D. N.Y. (1995) 945 FSCf
37. 117 S. CT. 940.

ON SUMMARY Judgment Judge is Not to
weigh the evidence, but Rather to
Determine if there is genuine issue
FOR TRAIL. ... FUTON by FUTON V WEST-
VACO, CORP. D. S. C. (1995) 930 F. Supp. 1115
AFFIRMED 87 F. 3d 1308.

    SUMMARY Judgment should not enter if
viewing evidence in light most FAVORABLE
TO NON MOVING PARTY, AND DRAWING ALL
RESONABLE INFERENCES in that PARTY FAVOR
RESONABLE JURY Could RETURN VERDICT
FOR that PARTY. YODER V HONEYWELL INC.
D. COLO. 1996, 900 F. SUPP. 240.

DEFENDANTS (C.C.A.) OWES PLAINTIFF HAGENS
A DISTINCT STANDARD OF CARE (duty); the
DEFENDANTS et al VIOLATED that STANDARD
OF CARE, (BREACH OF the Duty) OWES; the
VIOLATION OF STANDARD OF CARE CAUSED
PLAINTIFF INJURYS See (EXHIBIT 1)

PLAINTIFF HAGENS SUFFERED NECK, BACK
AND HEAD INJURYS SEE REPORT OF
INTERNAL AFFAIRS (Exhibit 1) DEFENDANTS
MEDICAL STAFF COVERED UP PLAINTIFF
HAGENS MEDICAL ASSESMENT ON
THE DAY (APRIL 1st 2004). DISTRICT OF
COLUMBIA V. CARMICHAEL 677 A2d 312
314 D.C. 1990)

THE DEFODANTS DISTRICT OF COLUMBIA
HAS A DUTY TO PROTECT PRISONERS AT THE
D.C. JAIL AND C.CA JAIL FROM UNRES-
ONABLE HARM THE DEFENDANTS DISTRICT
OF COLUMBIA BREACH ITS DUTY OWED TO
PLAINTIFF HAGENS WHEN IT ACCEPTED THE
CONTRACT FROM CCA WHEN IT KNEW OF
ITS WIDESPREAD NATIONALLY KNOWN
HISTORY OF ASSAULT ON D.C. RESIDENTS

THE DISTRICT OF COLUMBIA (FAILED) ITS
DUTY TO PROTECT PLAINTIFF HAGENS
AND BREACH ITS DUTY VIA THE
HIREING OF UNPROFFESIONAL GUARDS
WITH ABUSIVE HISTORY DEFENDANTS
LONDON AND MAYES...

DEFENDANTS LONDON VIOLATED PLAINTIFF
HAGENS 14 AMENDMENT TO THE U.S.
CONSTITUTION DUE PROCESS, AND
VIOLATED PLAINTIFF HAGENS 8th AMEND.
TO THE US CONSTITUTION WHICH
PROHIBITS CRUEL AND UNUSUAL

(8. page)

~~~~~~ VIII

punishment.

DEFENDANT MAYES, VIOLATED PLAINTIFF
HAGENS 14 AMENDMENT TO THE U.S.
CONSTITUTION due PROCESS AND
VIOLATED PLAINTIFF HAGENS 8th
AMENDMENT which PROHIBITS
CRUEL AND ~~~~~~ UNUSUAL
PUNISHMENT..

DEFENDANTS (C.C.A.) LONDON AND
MAYES ACTING UNDER COLOR OF
STATE LAW VIOLATED PLAINTIFF HAGENS
Liberty Interest which is CREATED
BY MANDATORY LANGUAGE, SHALL, MUST
SHOULD, IN THERE POLICY ON USE
OF FORCE CCA POLICY (4-1) WHICH
EXCLUDES USE OF "Choke Hold" SEE
EXHIBIT (1). See Hewitt V Helms
459 US 490 (MANDATORY LANGUAGE)!

DEFENDANTS (CCA) VIOLATED PLAINTIFF
HAGENS 14 AND 8 AMENDMENT TO
THE US CONSTITUTION by its OWN
CONSPIRACY TO HIDE AND COVER UP
ITS DEFENDANTS LONDON & MAYES
ASSAULTIVE BEHAVIOR, AND NOT
TAKING CORRECTIVE MEASURES to
PROTECT PLAINTIFF HAGENS thus
BREACHING its Duty STANDARD

## VIIII

OF CARE (duty). DISTRICT OF COLUMBIA V CARMICHAEL SUPRA... AND AS SHOWN AND PUBLIC RECORDS AND DOCUMENTS (see Exhibits)!

Here the Responsibility for the Plaintiff Hagens Transfer too (CCA) was delegated to "CCA" pursuant to Contractual Agreement, defendants violated Plaintiff Hagens rights in its failure to Protect, Supervise and train its employee's, wherefore ~~~~~ Abusing the position given them by the State DISTRICT OF Columbia See: West V Akins 487 US 42, 49 -50 (1988).

In deciding Amotion for Summary Judgment district Court must Read all facts in light most favorable to nonmoving party. Kreimeyer V Hercules Inc. D. Utah 1994, 892 f. Supp. 1374...

## RELIEF SOUGHT

(A). Award Plaintiff Hagens $250.000 00, thousand Dallars from District of Columbia for Punitive Damages

 (10 pge)

VV

(B.) AWARD PLAINTIFF HAGENS $ 150.000,00 THOUSAND DALLARS FROM DEFENDANT LONDON, FOR PUNITIVE AND COMPEN- SATORY, DAMAGES.

(C.) AWARD PLAINTIFF HAGENS $150.000 00, FROM DEFENDANT MAYES FOR PUNITIVE AND COMPENSATORY DAMAGES

(D.) AWARD PLAINTIFF HAGENS $250,000 00, thousand DALLARS FROM defend ANTS, (CCA) FOR PUNITIVE AND COMPENSATORY DAMAGES.

(E.) APPOINT COUNSEL to REPRESENT PLAINTIFF HAGENS PURSUANT to U.S.C. 1915(D)

(F.) AWARD PLAINTIFF HAGENS $250.000 00, thousand FROM DISTRICT OF Columbia FOR PUNITIVE AND COMPEN- SATORY, DAMAGES.

(G.) TRAIL by JURY PURSUANT to FED. R. CIV. P. 38.

I hereby SWEAR the FOLLOWING is TRUE to the best OF my Knowlege Raronta Hagens

5/12/06      3.1SFS-00J

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## DEPARTMENT OF CORRECTIONS

Office of the External Confinement
& Monitoring Administration



## MEMORANDUM

TO:        Keionta Hagens
           DCDC 284-792

FROM:      Barbara A. Hart
           Contract Monitor

DATE:      June 3, 2004

SUBJECT:   Response Letter

___

This memorandum is in response to your letter in reference to your property and alleged use of force. The property issue has been resolved as denoted by your signature on the attached "Release Form". The Internal Affairs is in the process of investigating your allegations of use of force.

( EXHIBIT (1) )



## CORRECTIONS CORPORATION OF AMERICA
Correctional Treatment Facility

| *Memorandum* |
|---|

**TO:**   F. E. Figueroa, Warden

**FROM:**   Don Paul
   **Internal Affairs Investigator**

**DATE:**   1 June 2004

**RE:**   Keionta Hagens, DC-DC 284792

**SUBJECT:**   Use of Force Review

---

Reporting investigator was directed to review a use of force which occurred on Thursday, April 1, 2004. Two staff members were primarily involved with physical intervention, namely Shift Supervisor James Mayes, and Shift Supervisor Dale London. The affected inmate that refused to comply with directives and resisted restraints was identified as Keionta Hagens, DC-DC 284792. Research suggests Hagens has an explosive history of assaults on correctional staff. Color photographs revealed latent hand marks about the neck of Hagens after he stopped resisting and was taken to medical, which became the focus of this inquiry. The narrative of the Incident Report 5-1A did not support or clearly present how those injuries occurred. The fact that Mayes was assaulted by Hagens was not disputed.

Shift Supervisor James Mayes was interviewed in Internal Affairs responsive to this incident. Mayes recalled that this use of force took place during the facility wide shakedown on April 1, 2004. He stated that Hagens became hostile and attacked him after being told that he would not receive certain property which had been confiscated as contraband. According to Mayes, Captain London was nearby and came to his assistance when Hagens jumped and struck him in the upper chest area. Mayes was asked specifically how the hand marks occurred on the neck of Hagens. Mayes stated that London did place his right hand on the neck of Hagens, and explained action that in the narrative of the report. Mayes was asked how long London left his hand on Hagens' neck. Mayes could not recall. Mayes was then shown the photographs of Hagens in medical taken some twenty minutes after the use of force occurred. The photographs clearly indicate possible choking. Mayes was asked to discuss where in CCA Policy 9-1 or PPCT training that use of sustained hand holds on the neck of a resisting subject were authorized or permitted. Mayes stated he was not sure if choke holds were authorized. Mayes was asked if London submitted an incident statement (5-1C) in reference to this use of force. Mayes could not recall. Mayes was asked if he knew who prepared the incident report on the use of force with Hagens. Mayes stated he thought London did.

Shift Supervisor Dale London was interviewed in Internal Affairs responsive to this incident.

Chief of Security Larry Bynum was present and observed. London was advised of the nature of the use of force review, specifically focusing on the hand marks about Hagens' neck and throat. Additionally, the inmate alleged that he had been choked during the confrontation. London was shown the photographs of Hagens taken in medical some twenty minutes after the incident occurred. The photographs clearly indicate possible choking occurred. London was asked if he submitted an incident statement (5-1C) in reference to this use of force. London stated that he did not, but had explained it in the narrative of the report. It was pointed out that Assistant Shift Supervisor Ricardo Rich was typed on the 5-1A Incident Report as the person preparing the report, but the language of the report suggested that London was the author. London admitted that he did prepare most of the narrative on the Hagens use of force (5-1A). In consideration of photographs showing a marked hand print about the neck and throat of Hagens, London was directed to describe in detail and explain how the incident occurred. London stated that during the shakedown, Mayes was assaulted by Hagens. In the process of trying to gain control of the unruly inmate, London stated that he attempted to grab hold of Hagens' shirt top, but his right hand slipped and ended up on Hagens' neck. When asked how long he held onto Hagens' neck, London initially stated he let go immediately. Photographs showing finger marks on Hagens' neck and discoloration about the trachea area was again presented for London to examine. It was pointed out that photographs of Hagens' neck and throat were made some twenty minutes after the incident, and latent markings and discoloration should not be as pronounced if London had immediately released his grip as claimed. London then admitted that he held Hagens by the neck several seconds and took Hagens down to the floor with his hand gripped about the neck. London was asked where in CCA Policy 9-1 or PPCT training that use of sustained hand or choke holds on the neck of a resisting subject were authorized or permitted. London shrugged his shoulders and did not answer. London was asked whether or not the resistance from Hagens was sufficient to support use of deadly force as a means of intervention. London stated that grabbing Hagens by the neck was not intentional. London was again asked if physical resistance by Hagens was sufficient to justify use of deadly force by choking. London again stated that grabbing Hagens by the neck was not intentional and he did not mean to choke him. It was pointed out for the record that London had omitted specific details of his role in the use of force and neglected to submit a 5-1C for the incident. The 5-1A on the incident also failed to mention any of the twenty minutes to the neck/throat area of Hagens in the 5-1A report. For the record, London was also informed that CCA does not authorize the use of choke holds anywhere in CCA Policy 9-1, Use of Force, nor are application of choke holds by hands alone taught as part of PPCT training. London was directed to submit a thorough 5-1C incident statement addressing his involvement in the use of force with Hagens.

Assistant Shift Supervisor Ricardo Rich was interviewed responsive to the Hagens incident report on the use of force. Rich admitted that he did not write the narrative contained on the initial 5-1A packet, and was not very familiar with the specific facts as cited. Rich believes London prepared this report, and most of the incident reports from the shakedown.

In conclusion, the facts of this inquiry suggest that a use of force was made unavoidably necessary by undisputed aggressive and assaultive behaviors initiated solely by Keionta Hagens without warning. Specifically Hagens violently struck Shift Supervisor Mayes in or about the upper chest. However, nothing in the record supports using an unauthorized choke hold to intervene and maintain control of Hagens' combative behaviors. Through his own conduct, Dale London failed to be completely truthful and honest when reporting his role in this use of force, and neglected to submit a 5-1C incident statement in the follow up investigation until directed to do so by Internal Affairs. During the interview, London was initially evasive and minimized placement of his hand on Hagens' neck, which inadvertently resulted in Hagens being choked during the scuffle. Under the scope of CCA Policy 9-1 on Use of Force, use of deadly force by choke hold or the equivalent thereof was not a supported intervention method based on the facts present within this incident. Failure by London to accurately report involvement in a use of force constitutes violation of CCA Policy 5-1 on Incident Reports, and

CCA Policy 3-3 on Business Ethics and Conduct.

**From:**      Fred Figueroa
**To:**        barbara.hart@dc.gov
**Date:**      06/03/2004 02:04:55 PM
**Subject:**   Investigation on Inmate Hagens # 284792

I have sent this to Charles Martin. I will advise you of the corrective action that is to follow.


Fred Figueroa
1901 E Street SE
Washington, DC 20003
Work 202 698 3006
Fax   2o2 698 3301
fred.figueroa@correctionscorp.com

---

**CC:**        Leggon, Rose

I have sent this to Charles Martin. I will advise you of the corrective action that is to follow.


Fred Figueroa
1901 E Street SE
Washington, DC 20003
Work 202 698 3006
Fax   2o2 698 3301
fred.figueroa@correctionscorp.com

Tennessee
Headquarters
10 Burton Hills
Nashville, TN Blvd
37215


Charlie
Martin

(EXHIBIT 2.)

**NBC**

**Dateline NBC**

**October 11, 1998**

Copyright (c) 1998 National Broadcasting Company, Inc. All Rights Reserved. Prepared by Burrelle's Information Services, which takes sole responsibility for accuracy of transcription. User may not reproduce any copy of the material, in whole or in part, except for user's personal or internal use.

Dateline NBC
October 11, 1998

CO-HOSTS: Jane Pauley and Stone Phillips

Announcer: This is DATELINE Sunday, October 11, 1998. Tonight:

They shared their community with hundreds of convicts, but when six inmates escaped, some residents said the private prison put their families in danger.

Unidentified Woman #1: You may not be so concerned about my safety or the safety of my grandchildren, but I am. Shut it down.

Announcer: Is the prison putting its bottom line above public safety?

ROB STAFFORD reporting: What was the number-one concern at that prison?

Unidentified Woman #2: Money.

Unidentified Man #1: Money. Profit.

Unidentified Man #2: Profit.

Woman #2: Profit.

Announcer: Rob Stafford on corporations and convicts.

In marriage, we love, honor and obey. So why do some men stray and stray and stray?

Unidentified Man #3: Four to 8 percent of men in the US have sexual compulsive traits.

Announcer: Experts say some men just can't help it.

Man #3: It's not about a high sex drive, it's about repetitive activities of sexuality that keep getting you into trouble that you can't stop.

Announcer: But can you really be addicted to sex?

KEITH MORRISON reporting: Isn't this just a way of justifying what is now considered to be immoral behavior?

Announcer: Keith Morrison on everything you wanted to know about sexual compulsion.

They're masters of the universe beneath the waves.

Mr. FRED SHARP: Well, the humpback is sort of the--the prima donna of the--the whale family.

Announcer: But are they more like us than we might imagine?

DENNIS MURPHY reporting: How smart, how human do you think they are?

Announcer: This man says his whale watching has revealed some extraordinary traits.

Mr. SHARP: They obviously have some ability to think about the future.

Announcer: Dennis Murphy with secrets from the deep, a DATELINE/Discovery Channel exclusive.

(Voiceover) In the beginning, the prison seemed like a great opportunity to the city of Youngstown, a city so depressed by the collapse of the steel industry it lost half its population in just 20 years. So when the Corrections Corporation of America, CCA, promised to pump millions of dollars into the economy by building a privately run prison, the community welcomed it with open arms.

(Construction of prison; factory; city street; prison being built; finished prison; community officials)

Mr. McKELVEY: I believe the facility would have worked, I believe it would have had a positive impact on our community.

STAFFORD: (Voiceover) George McKelvey is the mayor of Youngstown, Ohio. He was elected after the prison was built.

(George McKelvey on telephone; prison)

STAFFORD: Do you feel that this community was deceived?

Mr. McKELVEY: Oh, absolutely we were deceived.

STAFFORD: (Voiceover) Youngstown would get 350 desperately needed new jobs in return for providing cheap land for a 1500-bed medium security correctional facility, as stated in their development agreement, a facility built and operated by the nation's largest private prison company. Traded on the New York Stock Exchange, CCA is a multimillion dollar company, operating more than 75 private prisons. CCA came on with good references from other cities across the country. Youngstown officials weren't worried.

(City street; land; documents; CCA flag; New York Stock Exchange; prisons; inmates)

Mr. PHILIP CHANCE: We were originally told this was going to be a medium-level security operation.

STAFFORD: (Voiceover) Philip Chance is the sheriff of Mahoning County, Ohio.

(Philip Chance at desk)

STAFFORD: Do you think violent predators were dumped into your community?

Mr. CHANCE: Absolutely.

STAFFORD: (Voiceover) Violent offenders can be housed in medium-security facilities. CCA says it told the city that violent offenders would be housed at the Youngstown prison, and at least one news report supports that. But Sheriff Chance says the city signed an agreement for a medium-security prison, and expected inmates who were only of medium-security risk. But that's not how it turned out.

(Prison; newspaper article; prison interiors)

STAFFORD: CCA has said that this is a medium-security facility that only would house medium-security prisoners.

Mr. CHANCE: That's correct.

STAFFORD: So what happened?

Mr. CHANCE: Obviously they lied to us or their system broke down. Either way, the community is paying, isn't it?

(Karen Sessoms; prison)

Ms. SESSOMS: My question was where was the guards when the first person started stabbing him. How did he get to that point was where my anger came in, because they couldn't give me an answer.

STAFFORD: (Voiceover) But maybe this former guard can. He's upset to this day. He says there was constant danger inside the prison. He was on duty the day Karen's brother was stabbed.

(Prison; inmates)

Unidentified Man #2: It was right near shift change, and I was instructed to go ahead and head up to the clock.

STAFFORD: (Voiceover) He and other former guards say they were routinely told to leave their posts and punch out to save money on overtime, sometimes before proper backup arrived. They say the inmates knew there was less supervision during these shift changes, and they say that's often when violence occurred.

(Prison; inmates)

Unidentified Man #3: They'd pull us off our posts 15 minutes before shift change.

STAFFORD: You describe a prison that is out of control. But as corrections officers, wasn't it your job to keep it under control?

Unidentified Man #4: It's like any business, any country: You're only good as your leader.

STAFFORD: (Voiceover) Like many profitable companies, CCA has to try to control costs. And the former guards say limiting overtime was just one of many ways CCA would save money. They claim CCA also cut back on everything from food to medical care for the inmates.

(Prison; guards)

Woman #2: I wouldn't treat a dog the way they were treated. I'm sorry, but I could not stand the way CCA was running it. There--there is no human element at all. It's the dollar, the dollar, the dollar.

STAFFORD: (Voiceover) In fact, CCA's success has come from housing inmates for less than it costs the public sector. In this deal, Washington DC paid CCA 53.50 per prisoner per day, more than 28 million the first year alone. It's a lucrative contract for CCA, but less for the taxpayers who spent much more housing the same inmates at the public prison in Washington. How can this private company do it for less and still make a profit? These former guards say the drive to turn a profit was more important than security.

(Documents; prison; guards)

STAFFORD: What was the number-one concern at that prison?

Woman #2: Money.

Man #4: Money, profit.

Man #1: Money.

Woman #2: Profit.

STAFFORD: Not security?

inmates meets or exceed industry standards. And after the escape, CCA said, "We took immediate disciplinary action."

(Documents)

Professor CHARLES LOGAN: I've been studying CCA since its inception in 1984.

STAFFORD: (Voiceover) Professor Charles Logan has been researching private prisons for 15 years. He's not associated with CCA, but says it has a strong record and the problems in Youngstown are not representative of CCA's prisons.

(Charles Logan; prison)

STAFFORD: Isn't the bottom line making money?

Prof. LOGAN: No, the bottom line is actually providing the best possible service at the lowest possible cost. This is the only way in which you survive as a private company in competition with other private companies.

STAFFORD: (Voiceover) And Logan says, because of bureaucracy in the public sector, private prisons often respond faster to problems; as CCA did just one month after the escapes in Youngstown, including additional razor wire, more on-perimeter patrols, and three new gun towers. And last March, CCA hired a new warden to run the prison. And under his leadership, some former and current guards and even Youngstown's mayor say the prison is getting safer. But despite what's changed inside the prison, many who live outside still say CCA lost their trust a long time ago.

(Prison officials; prison exteriors; warden; city street)

Woman #1: You may not be so concerned about my safety or the safety of my grandchildren, but I am. Shut it down. Shut it down.

PAULEY: The city of Youngstown has joined the inmates in their lawsuit, and the widow of one of the two inmates killed in the Youngstown prison is also suing; she's asking for 110 million.

Announcer: Still ahead, they sing, they dance and leap, and they seem to behave in some ways remarkably like us. Planning ahead, working together.

Mr. FRED SHARP: They're very carefully choreographed.

Announcer: Just what traits do we share with whales? It's a DATELINE/Discovery Channel exclusive.

(Announcements)

Announcer: From our studios in New York, here is Stone Phillips

STONE PHILLIPS: Whales. We're fascinated by these mysterious giants of the deep. But are they more like us than we realize?

(Voiceover) In June, DATELINE brought you the story of Keiko, the superstar of the "Free Willy" movies and his extraordinary journey from a small pool in a Mexican show to international fame, a move to Oregon, and now transfer to a sea pen in Iceland, another step closer to a possible ocean release. Millions have followed Keiko's progress, getting a unique glimpse into a whale's world, how they think, how they learn...

(Keiko)

9

(Fred Sharp; whales)

Mr. SHARP: Coming out!

Unidentified Woman #3: Right here, right here.

MURPHY: (Voiceover) ...the humpback whale, in particular, for the past 12 years. He's an observer with an affectionate but unsentimental eye for the animals he observes in Alaska almost every summer.

(Sharp; whales)

Mr. SHARP: Equilibrium, Apollo.

MURPHY: (Voiceover) Humpbacks he gets to know so well by their markings and personality traits that he can pick them out year after year. He knows the sounds of individual voices when they sing.

(Sharp; whale pictures)

Mr. SHARP: I love the way he accents with his little "pudow." That's his signature. That's his sort of--that's his stamp.

MURPHY: (Voiceover) How smart, how human do you think they are?

(Whales)

Mr. SHARP: (Voiceover) They're very driven by emotions, and they obviously have some ability to think about the future like humans.

(On boat) Going down on the left, far left, looks like Big Mama.

(Whales)

MURPHY: (Voiceover) And Fred thinks their human-like ability to plan and to organize is best seen when the humpbacks go hunting for dinner. They use a fascinating technique called bubble net. Here's how it works: First, a humpback swims in a big circle, forcing air bubbles out through its blowhole; and that turbulent ring of bubbles forms a barrier on the surface, trapping the fish inside.

(Animation of whale forming bubble net)

MURPHY: So the bubble really is like a wall. The fish...

Mr. SHARP: Yeah.

MURPHY: ...can't get out of it for one reason or another?

Mr. SHARP: There's a lot of force with bubbles. It--it's a mechanical, you know, force in the water that frightens the prey.

MURPHY: (Voiceover) Then the leader, usually an older female, sends out this call. In whale language, that means, `Dinner is served.' The other humpbacks in the pod respond to that dinner call and then use their loud sounds together to roust out their catch.

(Animation of whales)

Dateline NBC
October 11, 1998

(Whales)

Mr. MARK FERRARI: If I'm a male, what I want to do is have a girlfriend when I get out of here.

MURPHY: (Voiceover) Whales with girlfriends are called escorts. They swim protectively, possessively close to a female and her calf. But the escorts always have to look over their dorsal for an envious competitor called the challenger.

(Whales)

Mr. FERRARI: (Voiceover) There he is, that's the escort maintaining his position with the female. There's the challenger right next to him.

(Whales)

MURPHY: (Voiceover) Now the challenger and the escort are ready to duke it out.

(Whales)

Mr. FERRARI: (Voiceover) Now he's blowing bubbles. See that guy over there, he's blowing bubbles now. You see that?

(Whales)

MURPHY: (Voiceover) The bubbles mean, `I'm bad, don't mess with me.'

(Whales)

Mr. FERRARI: (Voiceover) Look for the escort. You see how he uses bubbles as an aggressive sign to indicate to the other animals that he's the guy?

(Whales)

MURPHY: (Voiceover) But the challenger answers right back with his own bubbles and a menacing flip of his tail.

(Whales)

Mr. FERRARI: (Voiceover) What he's doing is he's showing the other guys, `I'm going to whack you in the head.' See that? You've got two animals blowing bubbles. Now it's really happening.

(Whales)

MURPHY: (Voiceover) And suddenly, it's all over. Sometimes these fights over a female can get bloody, but not this time. The female has seen enough. The new guy wins. The challenger has bragging rights for a while.

(Whales)

Mr. FERRARI: Now how long will this guy be the escort is the question? It could last 10 minutes, 20 minutes, a couple of days.

MURPHY: (Voiceover) Or it could be the real thing.

(Quote text)

Unidentified Man: (Voiceover) If a parent were to do that to their children, they would be prosecuted for sex crimes, and I think that the officers in charge should all be prosecuted for that.

(Quote text)

DATELINE FOLLOW-UP

PHILLIPS: Now DATELINE Follow-up, a brief look at what's happened since we brought you the story.

(Voiceover) In August, a DATELINE Hidden Camera Investigation took you shopping for vacation souvenirs from the Southwest. To see the kind of value you can get, DATELINE shoppers made purchases of Native American jewelry in several stores looking for the real thing, authentic works of art made by Native American craftsmen. What they discovered is just how easy it is to be fooled by imitations, plastics passing for turquoise and other stones, and pieces that just aren't authentic.

Since then, our story prompted the city of Santa Fe to take action against vendors who misrepresent their jewelry. By the way, during our report we visited the Gilbert Ortega Store in Gallup, New Mexico. The store is no longer owned by Mr. Ortega. Though he has other stores bearing his name in Phoenix and Scottsdale, Arizona, he is not affiliated with the one in New Mexico.

(People shopping at outside displays and in stores; jewelry; street in Santa Fe; woman going in a Gilbert Ortega Store; jewelry in store display; woman leaving Ortega store; sign for the Gilbert Ortega store)

DATELINE TIMELINE

JANE PAULEY: Now the DATELINE Timeline. All the following events happened during this, the second week of October.

(Voiceover) Do you know what year it was? The U.S. placed an embargo on all U.S. exports to Cuba.

(Dateline Timeline graphic; ship; woman stacking boxes)

Mr. CASEY STENGEL: (From file footage) They own the ball club. I don't have to discuss this with you.

PAULEY: (Voiceover) The New York Yankees fired manager Casey Stengel, "Ben Hur" was the hot movie, the "Untouchables" began its second season on TV, and Bobby Darin's new single hit the charts.

All right, what year was it, 1958, 1959 or 1960? The answer when DATELINE continues.

(Footage of Stengel; clip from "Ben Hur"; clip from "The Untouchables"; photo of Bobby Darin and "Artificial Flowers" music clip; Timeline graphic)

(Announcements)

PAULEY: (Voiceover) So what year was it? Stengel was fired, "Ben Hur" couldn't be stopped, and "Artificial Flowers" hit the charts. It all happened the second week of October 1960.

(Timeline graphic; Bobby Darin music clip; footage of Stengel; clip of "Ben Hur," photo of Bobby Darin)

(Announcements)

COMPULSION?

her sworn deposition in the Jones case, Browning claimed, quote, "When I confronted him with the issue of sexual addiction, he did not object. He listened attentively. He nodded. At one point he cried." But when Browning spoke to DATELINE about that conversation, she was very specific, claiming it went this way, word for word. Browning: "Did you ever think you might be a sex addict?" Clinton: "I know I am, and I've tried to overcome it." In his own deposition in the Jones case, President Clinton said, "Mrs. Browning was mad at me because I'd never been her lover."

(Footage of Dolly Kyle Browning on "Equal Time"; Clinton walking; highlighted text from deposition; photo of Browning with footage of a phone; text of conversation; pages of Clinton's deposition from the Jones case)

MORRISON: But wait a minute, how could anybody be addicted to sex? Does that sound like some new-age excuse for promiscuous behavior? Well, around the country are hundreds of 12-step AA-style programs for self-confessed sex addicts and sex therapists who say one in every 20 or 30 men in America is virtually addicted to behavior that is eerily similar to what we read in the Starr report.

Dr. ALVIN COOPER: It's not about a high sex drive, it's about repetitive activities of sexuality that keep getting you into trouble that you can't stop.

MORRISON: (Voiceover) Dr. Alvin Cooper, a psychologist who runs the San Jose Marital and Sexuality Center, says people like to joke about this sort of thing. But it's no joke, he says, it's real.

(Alvin Cooper in his office; close up of "Sex & Marital Therapy" book)

Dr. COOPER: People perform irrational acts, you know, smart people, successful people. When they do "dumb" things, then there's an explanation. You can't control it; that--that's sexual compulsion.

MORRISON: (Voiceover) Alvin Cooper admits he's never met Bill Clinton. Diagnosing the president, he says, would be a parlor game, albeit a popular one. But Dr. Cooper says the Starr report reveals patterns he has seen many times before. In fact, Cooper and other sex therapists have come up with lists of symptoms to identify sexual compulsives. Does the president's behavior fit this criteria? The number-one symptom on Cooper's list is "denial" with a capital D.

(Cooper leaving his office; pages and pamphlets on sexual compulsion; photo of Clinton; text of symptoms)

President BILL CLINTON: (From file footage) I did not have sexual relations with that woman, Ms. Lewinsky.

Dr. COOPER: They know right and wrong, but they're able to convince themselves that this time it's OK, or in this way it's not really damaging, that they're in a very high-profile position and that somehow they won't get caught. You know, that--that's denial.

MORRISON: (Voiceover) The president's denial, of course, became the prosecutor's deadliest ammunition. But then, there's symptom number two: repeated attempts to stop the offending behavior, to "go on the wagon." The Starr report quotes Monica Lewinsky on the president's efforts to achieve sexual sobriety. He told her, she says in her testimony, he's had hundreds of affairs in his life, but at 40 wanted to stop it. On another occasion, says the report, "The president told her he no longer felt right about their intimate relationship and he had to put a stop to it. Ms. Lewinsky was welcome to continue coming to visit him, but only as a friend. He hugged her but would not kiss her."

(Kenneth Starr; text of symptoms; the Starr report; highlighted text from the report)

Dr. COOPER: But that only lasts for so long, and then it starts creeping in again and they start slipping a little bit.

Dateline NBC
October 11, 1998                                                                                                    17

Mr. MALPELI: For 20 years we've been putting the bicycle on this tree, and no one has ever given me a hard time about it, not the police department, no one.

MANKIEWICZ: (Voiceover) But he would not accept responsibility for harming the tree. He argued that what hurt the tree were the cars and their pollution, the young lovers carving their initials, and the dogs doing, well, what dogs do.

(Cars driving by the tree; close up of the tree; dog next to the tree)

Mr. MALPELI: I tried to plant tulips in the dirt here around it a number of times, and they never take because the dogs come and just burn it out.

MANKIEWICZ: (Voiceover) The officers slapped Malpeli with a summons.

(Policeman writing a ticket)

Mr. MALPELI: After he wrote the ticket and the cops left, I looked at the ticket. It was for a thousand dollars. I almost died.

MANKIEWICZ: (Voiceover) A thousand dollars? For hurting a tree? In the eyes of City Parks Commissioner Henry Stern, Malpeli is a menace to society.

(People walking by the tree; Henry Stern walking a dog)

Mr. HENRY STERN: You should not put chains around trees, just as you should not put chains around people.

MANKIEWICZ: (Voiceover) But Stern is a firm believer in rehabilitation, so he went out on a limb and granted Malpeli amnesty on one condition.

(Footage of trees; Malpeli rubbing the tree)

Mr. STERN: We told him that if he apologized to the tree and gave it a hug, promised to water it every day and take good care of it, I would recommend to the judge that he be treated much more lightly.

Mr. MALPELI: (Singing) You're my honey locust, you're my honey locust tree.

MANKIEWICZ: So Malpeli turned over a new leaf and is trying to prove he's a changed man by conducting a very public springtime romance.

(Malpeli singing to and kissing the tree)

PAULEY: Mr. Marpeli now keeps his bike chained to the street sign next to the tree. This, we're told, is perfectly legal.

(Announcements)

Announcer: From our studios in New York, here again is Jane Pauley.

JANE PAULEY: Now let's take a look at some of the stories we're working on for DATELINE Monday.

(Voiceover) His mother thought he was the perfect son until he was arrested on drug charges. To stay out of prison, he decided to turn against the drug crowd and work for the police.

(EXHIBIT 3.)

# CBS

# 60 Minutes

# May 2, 1999

(c) MCMXCIX, CBS Worldwide Inc. All rights reserved. Prepared by Burrelle's Information Services, which takes sole responsibility for accuracy of transcription. No license is granted to the user of this material other than for research. User may not reproduce any printed copy of this material for commercial purposes or in any fashion that may infringe CBS Inc.'s copyrights or proprietary interests in such materials.

60 Minutes
May 2, 1999

MEDIUM SECURITY, MAXIMUM PROBLEMS

ED BRADLEY, co-host:

Three years ago, Youngstown, Ohio, a former steel town with double-digit unemployment, was approached by the Corrections Corporation of America with a proposal to build a prison, a prison that would mean at least 350 new jobs in Youngstown. CCA is the largest private prison operator in the country, part of a growing industry that operates the same way hotels and motels do: the higher the occupancy rate, the more money they make. And today, with so many prisoners being locked up, state and local governments are increasingly turning to companies like CCA, making private prisons a profitable business. Money was on Youngstown's mind, too. The city was so anxious for the jobs CCA would offer, they rolled out the red carpet for them.

(Footage of Bradley and Hagan talking)

BRADLEY: (Voiceover) Youngstown State Senator Bob Hagan wishes they hadn't.

State Senator BOB HAGAN: Oh, they got the greatest deal in the world. You know, you come to town and you say, `We're bringing all these jobs,' Youngstown says, `Great. Here's what we'll do. We'll give you free land or land for 1. We'll hook your utilities up for free. We'll give you 75-percent tax abatement for seven years.' What better deal can you get?

(Footage of prison complex; prisoners in rec areas and cells; visuals of headlines reading, `Guard gets stabbed during prison fight,' `Second stabbing causes confusion,' `Former prison guard fears "riot waiting to happen",' `Police go to prison to probe assault report'; footage of guard patrolling fence parameter)

BRADLEY: (Voiceover) But the sweet deal started to turn sour almost as soon as the medium-security prison opened. CCA had signed a contract with Washington, DC, and took more than 1,500 inmates from DC's overburdened prison system. Youngstown thought they were getting medium-security inmates--petty drug dealers, thieves, non-violent prisoners--but mixed in with them were hundreds of convicted murderers, rapists and violent prisoners. Soon, there were reports of multiple assaults, stabbings and even an inmate revolt. When Youngstown first tried to investigate, CCA refused to let them in. The prison was private and Youngstown had no authority to monitor it.

Were there any laws on the book governing the prison when it opened?

State Sen. HAGAN: Absolutely none. The--this state of Ohio, as many states in--in our Union, here, in fact, do not have regulations for private prisons. They can do what they want.

BRADLEY: So was it illegal to escape from a private prison? Was that a violation of the law?

State Sen. HAGAN: There was no violation of the law whatsoever. You could escape from this prison and walk out and the sheriff's department and the Youngstown city police department had no authority whatsoever to arrest that individual.

(Addressing Legislature) This place is out of control, ladies and gentlemen.

(Footage of Hagan addressing Legislature; police car with sirens on; officer with dog; officers on road; prison yard; police searching buildings and fields; police in pickup)

BRADLEY: (Voiceover) But in March of 1998, at Hagan's urging, the Ohio Legislature passed a bill regulating private prisons, including a provision that now makes it illegal to escape from one. It was just in time, because in July, Youngstown's worst fears were realized, when the chaos inside the prison spilled out beyond the prison walls into the streets and neighborhoods of Youngstown. Police and federal agents were called in to search for six inmates--five of them murderers--who broke out of the prison in broad daylight.

3

**60 Minutes**
**May 2, 1999**

BRADLEY: (Voiceover) According to these former guards, who worked at the prison when it first opened, CCA knew from the start that they were getting inmates who shouldn't have been there.

What did they tell you about the inmates who were coming there?

Unidentified Man #1: They told us we were getting the worst of the worst inmates. These inmates were...

Unidentified Man #2: Murderers, rapists.

Man #1: Murderers, rapists.

Unidentified Man #3: Killers.

Man #2: Robbers.

Man #1: Robbers. Yeah, we're getting the worst.

BRADLEY: Did you express any of your concerns to any of your supervisors, superiors, the warden?

Unidentified Man #4: Didn't do any good.

Man #1: They--they had their own...

Man #4: Warden stood right there and told us, `This is what we've got to expect, because Washington, DC, is going to send us the worst first. They want to get rid of them.'

Man #2: I asked the warden. I--I said, `Well, it's a medium-security facility. How can you send maximum-security, high-risk inmates?' He said, `Well, we're reclassifying them.'

BRADLEY: So they're taking someone who's maximum-security and just putting a medium-security label on them.

Man #4: Right.

Man #2: Right.

(Footage of inmates in prison; India Chisley walking; photos of the Chisleys; footage of Alphonso White in court)

BRADLEY: (Voiceover) Not only did CCA house maximum-security inmates at Youngstown--which they shouldn't have--they housed them with less dangerous, medium-security inmates, the equivalent, prison experts say, of putting predators with their prey, as India Chisley found out. Her husband, Bryson Chisley, a medium-security drug offender at Youngstown, got in a brawl in December of 1997 with this man, Alphonso White, a maximum security, two-time convicted murderer. When India Chisley visited her husband, who was being housed in the same unit with White, he told her White was continuing to threaten him.

Ms. INDIA CHISLEY: He was, like, `I can't eat. I can't sleep. I constantly have to watch my back.' He was, like, `And I'm afraid.' He said, `I keep dreaming I'm going to die in here.' And I remember leaving there in tears saying, `Bryson, I'm going to get you out of here. I promise.'

(Visuals of letters written by Ms. Chisley)

BRADLEY: (Voiceover) India Chisley contacted everyone she could think of: elected officials, the DC Department of Corrections and CCA headquarters, asking them to help her husband.

(Footage of Bradley and Austin talking)

BRADLEY: (Voiceover) Why did CCA accept inmates who didn't belong in their prison in Youngstown?

Mr. AUSTIN: One could only speculate. And this is, you know, what I would consider to be the potential dark side of privatization. If your beds are not full, you're not making money. And one has to wonder, you know, whether or not that profit interest was driving some of the decisions to let these kinds of inmates come to a prison that was not suited for them.

BRADLEY: Last December, this investigative report, commissioned by the US attorney general at the request of the governor of Ohio, found pivotal failures and fundamental breakdowns in CCA's operation of the Youngstown prison.

(Footage of report to attorney general; excerpt reading "a devastating convergence of security lapses...", "...preventable and should never have occurred.", "...informed, willing and mutually responsible players..."; footage of John Clark in his office)

BRADLEY: (Voiceover) It reported that Bryson Chisley's death was `a devastating convergence of security lapses' that was `preventable and should never have occurred,' and that Washington, DC, and CCA were `informed, willing and mutually responsible players' in sending maximum-security inmates to Youngstown. John Clark, who wrote that scathing report for the Justice Department, says over 800 inmates will be removed for safety reasons from the CCA prison by April. And why were any inmates in Youngstown who shouldn't have been?

Mr. JOHN CLARK: I think financial decisions were overriding good correctional judgment.

BRADLEY: And in putting prisoners in there because that's how they earn their dollars--their money--they're putting lives at risk, lives of inmates, lives of staff, and ultimately, lives of people who live in Youngstown.

Mr. CLARK: In the end, that was a practical effect, that the most basic correctional mission of the safety of the institution and the safety of the inmates was compromised.

(Footage of District of Columbia government letterhead; CCA letterhead with overlay of picture of Crants; excerpt from letter reading, "...we must respectfully decline your request for an interview."; Mayor McKelvey in his office)

BRADLEY: (Voiceover) The District of Columbia refused our repeated requests for an interview, citing ongoing litigation. CCA chairman Doc Crants agreed twice to an interview with us. Twice, he canceled. The last time, he also cited ongoing litigation. Mayor McKelvey of Youngstown isn't surprised CCA agreed to one thing and then did another. He believes CCA is one of the most deceitful corporations he's ever dealt with.

Mayor McKELVEY: I'm not a favorite of this company. The minute we knew that there were inappropriately classified inmates at the facility, I said, `You back the buses up to the front door, and you get them the hell out of my town.' And now they're doing that. They should have done it 12 months ago.

BRADLEY: For--for you, has this been a--a--a shell game, a--a--a cover-up, deliberate negligence? How would you categorize what's happened out there?

Mayor McKELVEY: All of the above.

BRADLEY: Would you recommend CCA to other communities?

(EXHIBIT 4.)

To: DCC     Date: 5-23-04    SMU-17

FROM NAME, FIRST, LAST: Keionta Hagens    DCDC #: 284-772

PLEASE INDICATE BY CHECK (✓) THE NATURE OF REQUEST

( ) CLASSIFICATION OF RECLASSIFICATION
( ) PERSONAL OR FAMILY PROBLEM(S)
( ) VISITING LOG
( ) NOTARY
( ) ESCORTED TRIP
( ) CANTEEN
( ) INTERVIEW COUNSELING/APPTS.

( ) PAROLE
( ) CUSTODY REVIEW
( ) LEGAL CALL
( ) SENTENCE STRUCTURE
( ) SQUAD CHANGE
(X) OTHER

COMMENTS: I WAS ASSult by Two Cap't They NAME is
MAye And london With handcuffs on me be hin my
black I Suff INjuries to my Neck ribs rebirs, I did
not Assult Nent one they is liying on me

[blank lines]

CTIONS TAKEN/REMARKS:

[blank lines]

D.C. DEPT OF CORRECTION
CORRECTIONAL TREATMENT FACILITY
LAW LIBRARY
1901 E STREET SOUTHEAST
WASHINGTON, D.C. 20003

team veer between apparent wide-eyed naïveté and truculence.

Is Thabo Mbeki's media shyness the result of a deep-rooted pathology—a hangover of Stalinism, a symptom of his paranoia, a lack of confidence—or is it a strategic gambit? Whereas Nelson Mandela continues to make a fetish of his biography, inviting the whole nation, nay, the whole world, to identify with it ("I was in chains, you were in chains; I am now free, you are now free; I can

forgive, you can forgive"), the Mbeki impulse is quite the opposite: He governs through being unknowable. The more distant he is, the more powerful he can be. "If you want to know me," he seems to be saying, "listen to my message. That's all that matters."

It's a good message, but can he implement it? Only when he has stepped out of the great man's shadow and into the light of his own presidency will we be able to tell.                                ∎

---

## THE LARGEST PRIVATE PRISON FIRM CONTINUES ITS PATTERN OF ABUSE AND PROFIT.

# CCA, the Sequel

### ERIC BATES

James Neal is a short, muscular man with close-cropped hair who has spent the past twelve years behind bars for armed robbery. He is also one of the most valuable commodities to trade hands in Youngstown, Ohio, since the steel industry abandoned the city more than a decade ago. In 1997 Neal was among the first "loads" of inmates bused from the District of Columbia to a new prison run by Corrections Corporation of America, the world's largest operator of for-profit lockups. CCA stood to make $182 million guarding the prisoners, and Youngstown-area residents lined up to apply for hundreds of jobs with the company. Those who toured the prison before it opened were assured they need not worry about the supply of out-of-state inmates. "If one of them dies," a company tour guide said, "they'll send another one."



The day after Neal arrived, a few of his fellow prisoners argued with guards about their treatment. Although the warden later admitted that no one was in danger and no property was threatened, CCA responded to the inmate complaints by dropping canisters of tear gas designed for outdoor use into four cellblocks. As hundreds of blinded and choking prisoners gasped for air, a team of black-uniformed officers in full riot gear known as the "Goon Squad" handcuffed them, beat them and sprayed them in the face with Mace. "It was kind of like a war atmosphere," says Neal, wearing a dark-green prison uniform. "You could hear the canisters whistling down and exploding—whump! No life or limb or property was at stake. CCA just overreacted. I thought, 'Damn, they could have killed me.'"

The excessive use of force proved to be a prelude to stark mistreatment at Youngstown. The medium-security prison was actually taking many maximum-security inmates, and the inexperienced CCA guards were ill prepared to handle the volatile mix. More than twenty prisoners were stabbed in the first ten months, and two died from their wounds. At least seven inmates died from medical conditions, and the company's own audit showed that the prison provided inadequate care to hundreds of prisoners. After Neal and other prisoners filed a class-action lawsuit over substandard treat-

ment and excessive force, CCA once again ordered the riot squad into the cellblocks, forcing inmates to strip, parade naked in front of female staff and lie on the concrete floors for hours while their cells were searched. "I felt like I was on a slave ship," Neal recalls. "I never felt anything so humiliating in my entire life."

Public officials paid scant attention to the abuse of prisoners, however, until the danger began spilling over the razor-wire fence surrounding the prison. Last July six inmates escaped in broad daylight by cutting through the fence—a technique they had routinely practiced in front of guards, snipping the wire to trip the alarms and then running back into crowds of inmates playing softball on a nearby field. After the breakout Ohio Governor George Voinovich called for the prison to be closed and Attorney General Janet Reno ordered a federal investigation.

The abuses at Youngstown are scarcely isolated incidents. Since *The Nation* reported on CCA last year [see "Prisons for Profit," January 5, 1998], the company has experienced more than its share of prisoner escapes and brutality by guards. Coming so close together, the repeated misconduct underscores the way private prisons cut corners at the expense of workers, prisoners and the public:

§ The lack of training for guards and the lack of programs for inmates in private prisons exacerbate violence. In Tennessee a prisoner transferred from Youngstown was stabbed and killed last August by another inmate shipped from Ohio. At another prison in Tennessee, CCA covered up abuses of inmates transported from Wisconsin, who were thrown against walls and zapped with stun guns. Eight company employees, including the security chief, were fired after the incident became public. In New Jersey the company improperly restrained and forcibly sedated immigrants awaiting hearings; in Arizona inmates demonstrated at a CCA prison to protest the lack of recreational and educational programs.

§ Lax security at CCA prisons across the country has enabled an unusually high number of escapes. At the company's South Central prison in Tennessee four prisoners cut through a fence late October with a bolt cutter they received in the mail: a guard who heard the alarm simply shut it off without investigating.

---

*Eric Bates is a staff writer for* The Independent, *an alternative weekly in Durham, North Carolina.*

(EXHIBIT 5)

In January a convicted killer walked out through the gates dressed in a guard's uniform given to him by a female employee. A Cuban immigrant overpowered a guard and fled from a CCA lockup in Houston, and a convicted killer in a DC jail run by the company climbed out a window undetected before falling eight floors to his death. Guards did not even notice anything amiss when an unidentified woman loaded the inmate's body into her car and drove him to a hospital.

Such an inability to handle the most basic function of a prison—keeping prisoners behind bars—seems to suggest that private companies are scarcely the efficient and reliable jailers they claim to be. After fifteen years of privatization, officials still have almost no reliable data to assess whether for-profit prisons are doing their job—or living up to their promise to save taxpayers money. "Only a few of the more than a hundred privately operated facilities in existence have been studied," a federal report concluded last October, "and these studies do not offer compelling evidence of superiority."

The lack of evidence hasn't stopped public officials from turning to private prisons like CCA. The company added more than 18,000 beds last year, thanks in no small part to its generosity. In Wisconsin, which has shipped more than 2,100 inmates to CCA prisons, the governor and six key legislators received $4,000 in campaign contributions from company chairman Doctor R. Crants. In Ohio the governor's brother received the contract to build the CCA prison in Youngstown.

Such friends in high places have helped CCA profit handsomely from crime. Net income for the first nine months of last year topped $60 million, up 63 percent from 1997. In April 1998 the company bought US Corrections Corporation, its second-largest rival, further securing its hold on the industry. But as competition declines, officials warn, so does the incentive for private prisons to offer competitive contracts. "CCA is so overwhelmingly bigger than everybody else, they'll win hands down," says Russell Boraas, who oversees private prisons for Virginia. "That's not good for the industry, and that's not good for taxpayers."

In reality, "CCA" now exists only as a brand name. The company stopped trading on the stock market in January, when it "merged" with a real estate trust it had formed. Prison Realty Corporation essentially operates as a tax shelter, enabling the company to evade paying any corporate income taxes. Under the arrangement, the trust rents its prisons to a management subsidiary run by the chairman's son. The subsidiary pays as much rent as possible, transforming its profits into tax-exempt "operating expenses" that it pays to the parent firm. The real estate trust, meanwhile, turns almost all of the rent money over to shareholders, thus sheltering its income from taxes as well. The scheme saves the trust $50 million a year in taxes—at the expense of CCA. On May 14 Prison Realty announced it would spend $86 million to prop up its troubled subsidiary. Its stock plummeted, and former shareholders filed a class-action lawsuit.

The real estate trust made out especially well in Youngstown. City officials eager to bring jobs to their depressed valley gave CCA 101 acres of land, free utility hookups and a five-year tax abatement for the prison. The company then sold the facility to the trust, pocketing $70 million. "This shows what private prisons are all about: profit," says Robert Hagan, a state senator from Youngstown. "That prison is nothing but a gulag."

The CCA prison in Youngstown stands on a hillside once home to several thriving steel-related industries. The area is now home to four major new prisons and a host of jails. "Prisons have become Youngstown's new economic base," says labor historian and activist Staughton Lynd. "It's so pathetic to see this working-class town, which has quite a proud history of militant unionism, become one more rural backwater living off the presence of prisons."

Like other nonunion operations, private prisons make most of their money by hiring fewer people and paying them less. Former guards say two-thirds of the Youngstown officers never worked in corrections before, and starting wages were $1,300 a year less than those of their counterparts at state-run prisons. "They don't care about the corrections officers, and they don't care about the inmates," former guard Daniel Eshenbaugh told the Cleveland Plain Dealer. "Everything there is about money." Another former guard explained how CCA got workers to take food from inmates to boost profits. "They gave us a rundown saying two slices of bread per inmate costs this much," he said. "If you can cut corners here, it would mean a possible raise for us."

> *'This shows what private prisons are all about: profit. That prison is nothing but a gulag.'*—Ohio State Senator Robert Hagan

While Youngstown represents some of the worst abuses at CCA prisons, it is also the scene of the biggest victory for inmates since privatization began. On April 20 a federal judge in Akron approved a landmark settlement of the class-action lawsuit filed by prisoners. The company has agreed to make cash payments of up to $1,000 to every inmate and create a common fund to settle claims by those with serious injuries—for a total of $1.65 million, the second-highest award ever paid to inmates in a class-action lawsuit. Even more startling, the prisoners were joined in their suit by the City of Youngstown, which will now employ two independent monitors to oversee conditions and medical treatment at CCA. The monitors have the power to order the warden to fix inadequacies and to fine the company if it fails to act.

"This is the first serious attempt to develop a way to hold a private prison accountable," attorney Al Gerhardstein said before the judge approved the settlement. "The inmates and the city are working together to hold them to the level of staffing and medical care and programs they promised. That raises a question: If you refuse to wink and let them get away with abuses as long as they come in under budget, can they still make a profit?"

Some activists feel the settlement doesn't go far enough. "We need to shut private prisons down," says Lynd. "The care and rehabilitation of prisoners is not consistent with the profit motive."

But until profiteering from prisons is stopped, inmates will come any step that reins in firms like CCA. "They run this place like GM or Ford," says James Neal, who urged the judge to approve the settlement. "It's like the defects in the Pinto. A $12 piece of steel would have corrected the problem, but their accountant showed it was cheaper not to fix it, even if people burned to death. That's the same way CCA runs prisons. If someone gets killed, so what? They just pay the family and give them some roses. They'll still be making millions off of misery." ∎