


**Next Register Number**

---

**31585-007  HAGENS, KEIONTA**

**-Comments-**

4/27/2005 CONTACT, CRISIS INTERVENTION BSY BRANDON R. OLIVE, PH.D.


Received a phone call from Education Services this date, stating that Mr.
Hagens was in the department requesting to be seen by a psychologist. He was
recently seen on 4/21/05 (see PDS) regarding medication issues and his
request for assistance with an incident report written on 2/4/05. See
contents of that notation for additional details. Mr. Hagens was permitted a
non-scheduled crisis intervention consultation today since the nature of his
request was unknown.

S: Upon presentation, Hagens alleged that "officers are trying to get to me".
He specifically mentioned that correctional officers (unspecified) had made
photocopies of his drawings and had been treating him differently, presumably
because they plan to physically assault him. Hagens believes this to be true,
per his report, because "this is what they did to me in the state". He then
intertwined this report with the issue discussed on 4/21/05 regarding the
expungement of an incident report. Hagens stated that "everybody refuses to
do anything because it's their way of keeping me here". He alleges that staff
have intentionally not considered his request(s) because it is the goal of
the BOP to keep beds "filled" at USP Big Sandy. Thus, he feels singled out as
an inmate destined to remain at an institution where he does not belong, and
the aforementioned incident report is a means of assuring his presence at
this facility.

I informed Hagens, as was the case on 4/21/05, that this is not an issue for
Psychological Services to address. I reminded him that psychologists do not
serve on the UDC's, and that I had already provided appropriate information
to his team as he requested. He then implied that this was "not enough"
because he is being treated unjustly by the system, and whomever he asks
about the issue (including his Unit Manager and the Warden) are determined to
keep him incarcerated at USP Big Sandy. Mr. Hagens was reminded that if he
has specific allegations against staff, it is his right to file a grievance
or report any inappropriate behavior. However, he will need to be specific in
terms of who carried out the behavior and specifically what was inappropriate
about it. Otherwise, his complaints will probably not be taken seriously.
Hagens contemplated this for a moment, and then stated he had considered
placing himself in SHU to "protect me from staff". Further discussion ensued
regarding the advantages or disadvantages of this action. Hagens offered that
if he requests protective custody, this will somehow trigger some action by
higher authorities to investigate his claims more seriously. Ultimately, I
encouraged Hagens to do whatever he felt necessary to resolve the issue,
whether it be filing a written complaint or requesting protective custody.
However, it was emphasized that communication with staff and going through

proper channels to informally resolve grievances is usually the desired path and the least disruptive action to his daily living routine. Hagens seemed satisfied with these recommendations, and stated he would consider what his next line of action would be.

O: Alert, fully oriented, with no evidence of psychosis or thought disorder. Whereas Hagens has made references to beliefs that officers are "out to get him", the flavor of these allegations and beliefs is unaccompanied by additional symptoms consistent with clinical psychosis. Additionally, it has been made known to this writer that Hagens has approached various other staff members regarding the same issues. It would appear he is "staff shopping" at this point to beat the incident report, or at least on the surface his behavior suggests this motive. He exhibits good hygiene and behavior is goal directed. There are no abnormalities of speech or psychomotor movement. He denies suicidal/homicidal ideation, plans, and intentions. There is insufficient evidence of acute mental illness, although his sleep may be legitimately disturbed and mood may be transiently irritable and depressed as is typical in an Axis II manifestation. A referral for Rx was previously submitted following Hagen's last consultation with this writer.

A: As above, inmate Hagens was redirected in his search for assistance with UDC issues. His clinical issues, or at least those pertinent to Psychology Services, are being addressed at present by a Health Services consultation. There were no additional mental health issues warranting scheduled followup for counseling.

P: Hagens will be followed as needed for medication issues, if needed. At this point, there will be no scheduled followup. Inmate was reminded that he can seek out additional contacts at mainline or by submitting copouts to Psychology Services.

4/21/2005 EVAL/RPT COPOUT BSY BRANDON R. OLIVE, PH.D.

S: Inmate Hagens was placed on callout this date upon his written request (copout). It was notable that Mr. Hagens was last seen by this writer on 1/27/05, at which time he was referred to Health Services for an increase in Doxepin (based on inmate's claim that Doxepin controlled mood/irritability).

This date, Hagens wished to discuss a couple of issues. First, he alluded to some references made on 1/27/05 (see PDS), wherein he alleged that correctional officers had assaulted him while incarcerated in state custody. Mr. Hagens was interested in what type of details had been documented regarding his claim. The PDS notation was pulled up and reviewed with Mr. Hagens present. Indeed, a reference had been made by this writer, but not to any great length because it was not a primary focus of his last consultation ("Inmate also states he has recurrent dreams of being assaulted by correctional officers in a state facility several years ago"). Initially, Hagens stated he was going to ask for a copy of the record, but he stated he no longer needed it because it would not help a civil case he has pending against staff members at the former state institution. At this point, he seemed to lose interest in this issue and proceeded to another.

Mr. Hagens described that in February, 2005, he received a 300-level incident report (Being Absent From Assignment) for missing a mandatory safety meeting. After the incident report was written, he claimed that taking Doxepin made it difficult for him to keep appointments secondary to excessive sedation. He claims to have slept through the meeting entirely(which was scheduled around 6:30pm), because he had taken his evening sleep medication around 4:30pm. Thus, he claimed not to be responsible for missing the appointment, and

attributed the blame for being absent on his psychotropic medication. He asked if this writer could support an expungement of the incident report, based on the side effect profile for Doxepin.

A number of interventions took place at this point. First, a lengthy discussion ensued regarding medication side effects and how sedation is common for some drugs. It was differentiated for Mr. Hagens how sedation and cognitive confusion are not synonymous terms. As such, this writer informed Mr. Hagens that a list of typical side effects could be provided to his unit manager and/or members of the UDC, but that it would be under their jurisdiction to consider his request to expunge the incident report. We discussed how documentation outlining the sedative properties of Doxepin would not support or refute the causality of his medication yielding the behavior in question (i.e., missing the appointment). Additionally, it was pointed out how this was the first time any new adverse side effects had been reported to Psychological Services since 2/4/05, which was over two months ago. During January, 2005, he mentioned sedation as a side effect but reported the benefits of Doxepin outweighed the negative aspects of the drug. Mr. Hagens said he understood and requested the information be provided to the UDS nonetheless.

A call was made to the USP Big Sandy pharmacy to verify that Mr. Hagens had an active prescription on the date in question (2/4/05), which he did: Doxepin 50mg QHS and Prozac 40mg QD. Hagens claimed, however, that he has not taken any medication since the incident report was written because "I couldn't get written up for anything else". Currently, Hagens states he needs the medication again but has been unable to get it after self-discontinuing back in February, 2005. The prescriptions ultimately expired on their own last month. Hagens alleges now that his mood is depressed, and he "thinks about being assaulted" all the time. He requested a reinstatement of the prescription(s).

O: AAOx4. Mood reported as depressed, though affect was essentially pleasant and unrestricted in range. Speech was clear and coherent. Denies SI/HI. No evidence of psychosis or thought disorder. Grooming and hygiene were normal. No abnormalities in psychomotor movement were observed. Demeanor was persistent and somewhat argumentative, but generally socially appropriate.

A: This writer agreed to offer another OPD referral to have Mr. Hagens' medication reinstated. It was also agreed to summarize the medication side effect profile of Doxepin to his unit team, without any form of recommendation concerning the status of his incident report. Both of these interventions were completed following our session. This writer also later spoke to Mr. Hagen's unit manager in person to discuss the issue. This writer was in agreement that Mr. Hagens appears to be building a case simply to "beat" the incident report. Hagens claims the situation is critical to him because this was his first disciplinary writeup. He claims his security points will not sufficiently drop to transfer him out of the penitentiary if the report remains on his record.

P: (a) OPD referral with recommendation to reinstate prescriptions.

    (b) As above, consultation with unit team regarding medication side effects, but without any recommendation to expunge the incident report. This will be at the discretion of the UDC.

    (c) No additional f/u is recommended at this point in time, with the exception of periodic monitoring as needed.


1/27/2005 EVAL/RPT PSYCHIATRY CLINIC BSY BRANDON R. OLIVE, PH.D.

S: Inmate Hagens was seen this date on callout for Psychiatry Clinic. He recently described that changes in his Rx regimen were creating some problems. Specifically, Mr. Hagens receives Fluoxetine (Prozac) 40mg QAM and also Doxepin (Sinequan) 25mg QHS. For a period of one week, he was receiving Doxepin 50mg QHS. On this dose, he was more sedated during the day but also much less irritable. He feels that the higher dose of Doxepin was instrumental in controlling his anger and promoting better mood control. Inmate describes sleeping well, but has low appetite. His overall mood is described as "mildly depressed". Inmate also states he has recurrent dreams of being assaulted by correctional officers in a state facility several years ago.

O: AAOx4. Mood mildly depressed with congruent affect. Denies SI/HI. No evidence of psychosis or thought disorder. Grooming/hygiene WNL. Psychomotor activity WNL. Demeanor cooperative. Speech coherent and goal directed.

A: Mild to moderate mood symptoms, including tendency towards irritability which inmate claims was better controlled on a higher dose of Doxepin. Will submit referral to Health Services for an upward titration.

P: (a) Referral to Health Services. Evaluate appropriateness of returning inmate's dose of Doxepin to 50mg po QHS, or higher.

    (b) RTC for monitoring as needed. Inmate may submit copouts on a PRN basis. If Rx adjustments are ineffective at reducing sxs, consider utilizing telepsychiatry services with USMCFP Springfield. No MDS code justified at this point in time.

9/30/2004 SHU REVIEW BSY TERRY KING, PH.D.

Hagens is a new protective custody inmate.  He was asleep when I approached his cell.  We talked briefly. He denied any problems or concerns of a mental health nature and none were evident.

9/3/2004 EVAL/RPT PROTECTIVE CUSTODY EVALUATION BSY JERRY O'TOOLE, PSY.D.

REASON FOR REFERRAL Inmate was seen in Special Housing Unit this date in order to assess his level of adjustment to Protective Custody/Segregation, and to discern if additional psychological services are warranted.  Inmate Hagens stated that he did not request placement in protective custody. Initially, he denied knowing any reason why he might have been placed into PC by Custody staff.  In the course of the evaluation, he reported that during a telephone conversation, his father had said some things that came to the attention of Custody staff.  He did not disclose what his father had said, but indicated he was interviewed for a "threat assessment."  He claimed to not know what all this was about and expressed anger that he is being punished for what someone else might have said.  He went on to talk about his rights being violated and that he is "going to put paper on" all those who are responsible for violating his rights.  At no time did he threaten harm to himself or others.

MENTAL STATUS:  Current mental status, emotional expression, and overall behavior do not suggest significant mental health problems.  Inmate Hagens demeamor was irritable and unhappy.  He was adequately cooperative with the evaluation process, but did attempt to become arguementative at times.  The

inmate demonstrated poor judgement, insight, and understanding regarding his current circumstances, but did not appear to have a plan to behaviorally act out in an aggressive manner. Inmate Hagens did not appear to be suffering from any significant mental illness or defect.

ADJUSTMENT: Current psychological adjustment is SATISFACTORY. At the present time, being in the Special Housing Unit due to Protective Custody does not appear to significantly affect this inmate in an adverse manner.

THREAT TO SELF: Precise and accurate prediction of self-injurious behavior is difficult and should be mofified over time as individual circumstances arise or change. Based on the inmate's history, existing conditions, and other information available at the time of this appraisal, the current estimated risk of self-harm is judged to be LOW.

THREAT TO OTHERS: Precise and accurate prediction of dangerousness is difficult and should be modified over time as individual circumstances arise or change. Based on the inmate's history, existing conditions, and other information available at the time of this appraisal, the current estimated potential for harm to others is judged to be LOW.

cc: Warden
    AW(P)
        Captain
    SHU Lieutenant
    Health Services
    SIS


6/21/2004 EVAL/RPT DAP RECOMMEND BSY JAMES SNODGRASS, B.S.


You were recently seen by a psychologist as part of the routine mental health screening process that all inmates complete upon their arrival to USP Big Sandy. During the course of the interview, the psychologist spoke with you about your history of substance abuse. Based on the interview or information contained in your file, it was determined that during some period in your life you had significant issues with substance abuse or dependence. Subsequently, they felt you might benefit from participation in treatment opportunities available to you during the time you are incarcerated.

The Federal Bureau of Prisons offers a variety of drug abuse treatment options: Drug Education, Non-Residential Drug Abuse Treatment, and Residential Drug Abuse Treatment. (Please see the attached memo for more detailed information regarding these programs).

Should you desire to participate in one or more of these programs please send a cop out to Mr. Snodgrass, Drug Treatment Specialist or Dr. O'Toole Drug Abuse Program Coordinator.


6/15/2004 INTAKE SCREENING BSY JERRY O'TOOLE, PSY.D.


    Mr. Hagens was seen for individual psychological intake screening interview. At this time, he appears to be adjusting appropriately to incarceration. No overt psychological problems were reported or observed. There was no evidence suggestive of active psychosis or discernible mood/anxiety disorder. He denied any current suicidal/homicidal ideation, plans, or intentions. Verbalizations were clear/coherent. Grooming and general appearance suggested adequate attention to personal hygiene. Psychomotor activity was WNL. Demeanor during the interview was appropriate.

Mr. Hagens was also screened for mental disabilities, and none were overtly observed or reported during this appraisal. He did report past psychological treatment while incarcerated in the county jail in 2003. He apparently received news of his brothers death and had a difficult time emotionally coping with the situation at that time. He reported being placed on medication, but was not certain what he had been prescribed. He believes one was Sinequin and another was "a mood stabilizer." He described the medication as helpful at the time due to feeling so upset. He currently is complaining of some moderate sleep disturbance, but this could be attributed to the recent transfer to this facility. Additionally, inmate denied both a history of being a sexual assault victim or perpetrator.

A history of substance abuse was reported (alcohol, PCP, ecstasy), for which substance abuse programming appears to be appropriate. Inmate was provided information regarding available programs and will be referred for additional assessment/evaluation by the institution's Drug Treatment Specialist and/or Drug Abuse Program Coordinator.

cc: DAP Recommend File